STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

21-716


STEVE CROOKS, ET AL.

VERSUS

STATE OF LOUISIANA, THROUGH THE DEPARTMENT
OF NATURAL RESOURCES


**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 224,262
HONORABLE MONIQUE F. RAULS, DISTRICT JUDGE

**********

SHANNON J. GREMILLION
JUDGE

**********

Court composed of Shannon J. Gremillion, Charles G. Fitzgerald, and Gary J. Ortego, Judges.


EXCEPTIONS DENIED;
AFFIRMED IN PART; REVERSED IN PART.

**Richard Traina**
**Steeg Law Firm**
**201 Saint Charles Avenue, Suite 3201**
**New Orleans, LA 70170**
**(504) 582-1199**
**COUNSEL FOR DEFENDANT/APPELLANT:**
> **State of Lousiana, through the Department of Natural Resources**

**Scott David Johnson**
**Assistant Attorney General**
**1200 North Third Street**
**Baton Rouge, LA 70802**
**(225) 326-6085**
**COUNSEL FOR DEFENDANT/APPELLANT:**
> **State of Louisiana, through the Department of Natural Resources**

**Machelle R. L. Hall**
**Morgan D. Rogers**
**Ryan S. Montegut**
**Ryan M. Seidemann**
**Steven B. "Beaux" Jones**
**Louisiana Department of Justice**
**Post Office Box 94005**
**Baton Rouge, LA 70804-9005**
**(225) 326-6000**
**COUNSEL FOR DEFENDANT/APPELLANT:**
> **State of Louisiana, through the Department of Natural Resources**

**Robert McCuller Baldwin**
**G. Adam Cossey**
**Hudson, Potts & Bernstein**
**Post Office Drawer 3008**
**Monroe, LA 71210-3008**
**(318) 388-4400**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
> **Steve Crooks, et al.**

**James J. Davidson, III**
**Christopher Joseph Piasecki**
**Davidson, Meaux, Sonnier, McElligott, Fontenot, Gideon & Edwards LLP**
**810 South Buchanan Street**
**Lafayette, LA 70502**
**(337) 237-1660**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
> **Steve Crooks, et al.**

**J. Michael Veron**
**Turner D. Brumby**
**Veron Bice Palermo & Wilson LLC**
**Post Office Box 2125**
**Lake Charles, LA 70602-2125**
**(337) 310-1600**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
  **Steve Crooks, et al.**

**Charles S. Weems, III**
**Robert G. Nida**
**Gold Weems Bruser Sues & Rundell**
**Post Office Box 6118**
**Alexandria, LA 71307-6118**
**(318) 445-6471**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
  **Steve Crooks, et al.**

**V. Russell Purvis, Jr.**
**Smith Taliaferro & Purvis**
**Post Office Box 298**
**Jonesville, LA 71343**
**(318) 339-8526**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
  **Steve Crooks, et al.**

**James L. Carroll**
**Attorney at Law**
**107 Riser Street**
**Columbia, LA 71418**
**(318) 649-9284**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
  **Steve Crooks, et al.**

**Bernard E. Boudreaux, Jr.**
**Emma Elizabeth Daschbach**
**John T. Arnold**
**Lindsay E. Reeves**
**Christopher W. Swanson**
**Jones, Swanson, Huddell**
**301 Main Street, Suite 1920**
**Baton Rouge, LA 70801**
**(225) 810-3165**
**COUNSEL FOR DEFENDANT/APPELLEE:**
  **Catahoula Lake Investments, LLC, et al.**

**Gladstone N. Jones, III**
**Kevin E. Huddell**
**Jones, Swanson, Huddell**
**601 Poydras Street, Suite 2655**
**New Orleans, LA 70130**
**(504) 523-2500**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Catahoula Lake Investments, LLC, et al.**

**Dale R. Baringer**
**William H. Caldwell**
**Ferdinand P. Leonards**
**Baringer Law Firm**
**201 Saint Charles Street**
**Baton Rouge, LA 70802**
**(225) 383-9953**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Foster Investment Corporation**

**Jimmy R. Faircloth, Jr.**
**Mary Katherine Price**
**Faircloth Melton Sobel & Bash, LLC**
**105 Yorktown Drive**
**Alexandria, LA 71303**
**(318) 619-7755**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Justiss Oil Company, Inc.**

**GREMILLION, Judge.**

The State of Louisiana, through the Department of Natural Resources (LDNR), appeals the trial court's determination of the low-water mark of the Little River in the Catahoula Basin. LDNR further filed exceptions of lack of subject matter jurisdiction and no right of action following the appeal. For the following reasons, LDNR's exceptions are denied. The trial court's judgment is affirmed in part and reversed in part.

## FACTUAL AND PROCEDURAL BACKGROUND

This case involves a long history of complex issues surrounding the classification of a body of water for purposes of determining whether LDNR wrongfully expropriated and damaged plaintiffs' lands in various ways, including obstructing the plaintiffs' servitude of drainage and the taking of mineral interest royalties belonging to the plaintiffs. While it has already been held that the body of water in question is a river rather than a lake, the low-water mark needed to be determined in order to classify what belonged to the riparian owners versus what was owned by LDNR. These proceedings pertain to the determination by the trial court of the low-water mark at 24.08 feet in the Little River located in the Catahoula Basin. The crux of LDNR's argument is that the trial court improperly used a summary proceeding, which is inappropriate for a boundary action, in setting the low-water boundary and improperly excluded all of its evidence relating to the low-water mark.

To summarize the lengthy background of this case:

In May 2006, the plaintiffs filed a "Class Action Petition to Fix Boundary, For Damages and For Declaration [sic] Judgment," primarily asserting inverse condemnation, damages to the plaintiffs' property, and the right to the recovery of oil and gas royalties and other payments.

Following a ten-day bench trial in January 2015, the trial court rendered a final judgment in May 2017. That judgment included a reference to its May 16, 2016 Reasons for Judgment[1] in which it ruled as follows:

> Specifically, and in summary, the court has concluded and does hereby hold that: (1) the body of water in the Catahoula Basin in 1812 was a permanent river that seasonally overflowed and covered its banks; (2) the riparian landowners ("Lake Plaintiffs") are the legal owners of these river banks; (3) the State is legally responsible and liable for the wrongful expropriation (inverse condemnation of the plaintiffs' lands because of the significant obstruction of the natural servitude of drainage; (4) these expropriation damages total $28,745,438.40 (i.e., 22,813.84 acres multiplied by $1260 per acre) for the riparian owners, and $9,550,800 (i.e., 7,580 acres multiplied by $1,260 per acre) for the owners of the owners of the overflow lands ("Swamp Plaintiffs"), all subject to legal interest from the date of judicial demand until paid; and (5) the riparian landowners are entitled to a total award of $4,694,309.68 together with legal interest from the date of judicial demand until paid, which sum represents the oil and gas royalties attributable to the mineral production from the river banks between May 2003 and the date of trial.

Based on those rulings, in its May 2017 judgment, the trial court stated in part:

> IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that there be judgment herein recognizing that the class of plaintiffs identified as the riparian landowner plaintiffs (also known as the "Lake

---

[1] The written reasons issued by Judge Boddie in May 2016 were 66 pages long. Regarding mineral royalties, he stated:

> Because of the court's holding that the evidence clearly and convincingly demonstrated that the body of water in the Catahoula Basin in 1812 was a permanent river that seasonally overflowed and covered its banks, it naturally follows that the riparian landowners are the lawful owners of these river banks. In turn, that result mandates that the "Lake Plaintiffs" are entitled to recover the mineral royalties attributable to the riparian lands and which have erroneously paid to the state over the years.

> At trial, plaintiffs presented Dr. Paige, who was qualified as an expert in the field of forensic account. The State stipulated to the authenticity of the data Dr. Paige relied on in reaching his opinions. It is not disputed that the plaintiffs are only seeking to recover the royalties attributable to these leases during the three years before suit was filed as well as royalties to the present. The State agrees that if the plaintiffs are found to be entitled to any recovery based on their mineral claims, the proper amount received by the sovereign in royalties during this time period was the sum of $4,694,309.68. Thus, since it is undisputed that the state received $4,694,309.68 in royalties from May of 2003 to the date of trial, the riparian landowners are entitled and decreed to be the owners of those designated funds.

2

Plaintiffs") are the legal owners of the river banks in the Catahoula Basin, consisting of 22,813.84 acres of lands located between the ordinary low-water mark of the Little River and the ordinary high-water of 36 feet mean sea level of the Little River, which lands are depicted in light blue and referred to as the bed and bottom of the so-called "Catahoula Lake" on the State's exhibit introduced into evidence and identified as FW 202, a copy of which is attached hereto and made part of this final judgment.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that there be judgment herein recognizing that the class of plaintiffs identified as the overflow landowners plaintiffs (also known as the "swamp Plaintiffs'") are the legal owners of the 7,580 acres of land patented by the State of Louisiana in the southwestern portion of the Catahoula Basin, which lands are identified as property listing nos. 29 through 83, and as the lands owned by W.H. Ward Properties, Inc., on the State's exhibit introduced into evidence and identified as FW 202, a copy of which is attached hereto and made part of this final judgment.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the State is legally responsible and liable for the wrongful expropriation (inverse condemnation) of the class plaintiff members' lands- . . .because of the significant obstruction of the natural servitude of drainage.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that there be judgment herein in favor of the class of plaintiffs identified as the riparian landowner plaintiffs (i.e. the Lake Plaintiffs), and against the State, for the wrongful expropriation of their lands in the full sum of TWENTY EIGHT MILLION SEVEN HUNDRED FORTY FIVE THOUSAND FOUR HUNDRED AND THIRTY EIGHT DOLLARS AND 40/100 ($28,745,438.40), together will legal interest from the date of judicial demand, May 4, 2006, until paid.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that there be judgment herein in favor of the class of plaintiffs identified as the riparian landowner plaintiffs (i.e. the Lake Plaintiffs), and against the State, for oil and gas royalties attributable to the mineral production from the river banks between May 2003 and the date of trial in the full sum of FOUR MILLION SIX HUNDRED NINETY FOUR THOUSAND THREE HUNDRED AND NINE DOLLARS AND 68/100 ($4,694,309.68), together with legal interest from the date of judicial demand, May 4,2006, until paid.

The judgment declared awards of attorney fees, ordered the deposit of funds into the registry of the court, and made determinations regarding a variety of fees and incentive awards for the class plaintiffs' representatives.

This judgment was appealed to this court. In *Crooks v. State*, 17-750, p. 23 (La.App. 3 Cir. 12/28/18), 263 So.3d 540, 557, *writ granted*, 19-160 (La. 5/6/19), 269 So.3d 691, *aff'd in part and rev'd in* part, 19-160 (La. 1/29/20), __ So.3d __, we affirmed the trial court's finding that the Catahoula "Lake" was "'a permanent river that seasonally over-flowed and covered its banks.'" We further found that the plaintiffs' claims for inverse condemnation were not prescribed. We noted that one of LDNR's arguments on appeal was that the trial court erred in not setting "the location of the ordinary low-water mark to accurately determine the size of the allegedly taken property." *Id.* at 552. We affirmed the trial court's rulings relating to the acreage and value per acre and found no abuse of discretion in the trial court's determination of damages. Judge Amy dissented and would have found that the plaintiffs' claims for inverse condemnation were prescribed and that LDNR had acquired the property through acquisitive prescription. Judge Amy would have remanded with instructions to set the boundary between the Lake plaintiffs' land and the state's land at the thirty-six (36) feet mean level contour.

Thereafter, LDNR was granted a writ of certiorari on the issue of whether the lower court "erred in failing to find that the [p]laintiffs' inverse condemnation claims have prescribed." *Crooks*, 19-160 (La. 1/29/20), __ So.3d at __. LDNR filed a peremptory exception of no cause of action, asserting that the plaintiffs had no cause of action for mineral royalties and requested that the award of $4,694,309.68 be vacated. The supreme court reversed the court of appeal and held that the plaintiffs' claims for inverse condemnation were barred by the three-year prescriptive period. In overruling LDNR's exception of no cause of action pertaining to the mineral royalties, the supreme court stated:

> the State granted mineral leases on plaintiffs' lands, and received
> mineral royalties from those leases. Accepting these facts as true, the

4

plaintiffs have asserted a cause of action against the State for mineral royalties pursuant to La.C.C. art. 488[.]

*Id.* at ___.

While the supreme court specifically overruled the sums awarded for inverse condemnation, it did not make any statements regarding the mineral royalty award, but did state, "In all other respects, the judgment is affirmed." *Id.* at ____.

*The Current Matter*

The record resumes with the appeal of the current matter, which began with "Plaintiffs' Motion Regarding Issues on Remand (With Incorporated Memorandum of Authorities)" filed on July 6, 2020. In it, plaintiffs argued that the only issues that were changed on appeal were the award of damages for inverse condemnation and the allocation of the trial court's attorney's fee award between LDNR and the common fund. The plaintiffs state:

5.

The Court's now-final judgment on the river bank referred to and attached a map showing the extent of the land belonging to the plaintiffs. What remains to be accomplished, however, is the partition of this property to the individual plaintiffs who are riparian landowners. If the Court deems it necessary and desirable, this work may include further delineating the boundaries of both the river bed and river bank.

Plaintiffs thereafter requested the appointment of a special master because "certainly, partitioning 30,000+ acres of riparian land in a way that provides each owner with a proportionate share qualified as a 'complicated factual issue.'" However, the plaintiffs went on to state in a subsection relating to a motion for contempt and/or for writ of mandamus:

10.

While the supreme court reversed the award for inverse condemnation damages on grounds of prescription, neither it nor the court of appeal reversed, set aside, or modified this Court's award for oil and gas royalties wrongly possessed by the State. Thus, the original

sum, plus legal interest from May 4, 2006, must be deposited into the registry of the Court as per the now-final judgment.

On April 16, 2021, plaintiffs filed a notice of video deposition to cover certain topics including "The dimensions of the bank of the Little River through the Catahoula Basin property litigated in this case, *viz*, the land that the final judgment in this case determined the plaintiffs owned." On April 26, 2021, LDNR filed a motion to quash the notice of video deposition stating:

11.

Neither this Court, Third Circuit Court of Appeal, nor the Louisiana Supreme Court located the Little River. As a result, no definitive boundary exists at this time.

12.

While the State, like the Plaintiffs, believes that this is an outstanding issue in the above matter, no work to determine the public/private boundary has yet been done by the State. Moreover, on information and belief, the Plaintiffs have not advanced, despite multiple requests from the State, any reasonable methods to resolve this outstanding issue.

13.

Thus, the information that might be responsive to Topic Two does not yet exist and as such, there are no documents to produce.

On May 10, 2021, a hearing was held on LDNR's motion to quash notice of 1442 deposition.

Plaintiffs filed a "Supplemental Memorandum in Support of Plaintiffs' Motion Regarding Issues on Remand" on June 3, 2021, urging that it was entitled to additional funds for mineral royalties. The plaintiffs requested additional funds for oil and gas lease royalties, changing the sum allegedly owed to $10,129,825.15.

LDNR filed a "Partial Concurrence and Partial Opposition to the Class Plaintiffs' Supplemental Memorandum in Support of Motion Regarding Issues on Remand" on June 2, 2021. In it, LDNR claimed that future royalties were not part

of the trial court judgment and do not belong to the Class, but will belong to the proper landowners once boundaries are established. However, LDNR did not dispute the finality of the judgment awarding $4,694,309.68 for past royalties.

On June 4, 2021, the trial court held a hearing on the motion for matters on remand. Plaintiffs had a witness who was prepared to testify regarding the location of the low-water mark. LDNR stated that it did not believe testimony on the low-water mark issue would be presented but that "today was to set the process for determining the low-water mark." LDNR stated it would be a "complex scientific process" to determine the low-water mark and that no evidence regarding the low-water mark had been received during the first part of the trial that only determined the river-versus-lake issue. Plaintiffs, on the other hand, stated that "the low-water mark may have been overlooked. I'm not sure what happened to it, but's simply a remand matter. We have a Final Judgment saying we own the riverbank. So, all that's left for the Court is simply to say, 'This is where the low-water mark is.'" Michael Mayeux's proffered testimony was received.

On June 17, 2021, the trial court rendered a judgment following a June 4, 2021 hearing on the "plaintiffs' motion regarding issues on remand," ["Plaintiffs' Motion Regarding Issues on Remand (With Incorporated Memorandum of Authorities)"]. The trial court denied the plaintiffs' motion for mandamus or contempt and granted plaintiffs' motion "to determine the low-water mark of the Little River within two months." It further denied LDNR's request for additional time before the trial on the low-water mark. The judgment set the matter for trial on August 10, 2021.

The trial court's June 17, 2021 judgment relating to the June 4, 2021 hearing stated:

> IT IS ORDREED, ADJUDGED, AND DECREED that the plaintiffs' motion for mandamus or contempt against the Louisiana State Treasurer the Louisiana Department of Treasury, or the Defendant

7

Department of Natural Resources, are hereby DENIED pursuant to La.Const. Art. XII, sec. 10 and La.R.S. 13:5109(b)(2);

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the plaintiffs' motion to determine the low-water mark of the Little River within two months is GRANTED and the Defendant Department of Natural Resources' objection and request for additional time before trial on the low-water mark is DENIED. This matter is set for trial on the location of the low-water mark on August 10, 2021.

On June 24, 2021, LDNR filed a motion to add one day to the trial and to continue the August 10, 2021 trial date. LDNR's memorandum in support argued it would not have enough time to present its case in one day after the plaintiffs' presentation and LDNR's cross-examination of their experts and that the low-water mark determination was more complex than the plaintiffs claimed and that there was not one established means of determining the low-watermark as the plaintiffs urged relying on *State v. Cockrell*, 162 So.2d 361 (La.App. 1 Cir.), *writ refused*, 246 La. 343, 164 So.2d 350 (La.1964), and *State v. Placid Oil Co.,* 300 So.2d 154 (La.1973).

On July 2, 2021, the plaintiffs filed an opposition to LDNR's motion to continue, stating in part:

10.

The final judgment of this Court, as a matter of *res judicata*, bars any location of the river channel to include any portion of the river banks that the Court previously recognized belonged to the plaintiffs and for which they were awarded mineral royalties. That finding was "essential" to the final judgment and cannot be relitigated.

On July 2, 2021, the trial court denied LDNR's motion for an additional day and a request to continue in a handwritten notation that the "matter had been pending since 2006."

On July 7, 2021, LDNR filed a "Reply in Support of its Motion to Add One Day To the Trial and to Continue the August 10, 2021 Trial Date And Motion in Limine Regarding the Scope of the August 10, 2021 Trial." Neither of these motions is in this record. LDNR attached the missing motions to its brief. These two motions

were filed on June 21, 2021. One of LDNR's motions in limine sought to restrict the testimony of Michael Mayeux. In the second motion in limine, LDNR stated in its memorandum:

**I. The parties appear to agree that the Motion in Limine Regarding the Scope of the August 10, 2021 Trial should be granted.**

On page 3, paragraph 9 of their opposition, the Plaintiffs state they essentially agree with Natural Resources' position on the scope of the August 10 trial:

The State has moved in limine for a ruling that the only issue set for hearing is a determination of the ordinary low-water mark of the Little River. To the extent this determination includes both the computation of the ordinary low-water mark and its location in the Catahoula Basin, the plaintiffs agree.

Therefore, this Court may grant that motion. The Parties shall not present evidence to prove which persons own which riparian land, which persons have oil and gas rights, or the locations of any oil or gas wells in the banks or bed of the Little River in the Catahoula Basin.

On July 13, 2021, the plaintiffs filed an appeal of the trial court's denial of their request for a writ of mandamus. On appeal, a panel of this court reversed the trial court's denial of the plaintiffs' writ of mandamus but did not find LDNR in contempt. *See Crooks v. State, through Dep't of Natural Res.*, 21-633 (La.App. 3 Cir. 3/16/22), __ So.3d __.

On July 16, 2021, LDNR filed an exception of nonjoinder.

On July 19, 2021 plaintiffs filed an "Opposition to Louisiana Department of Natural Resources' Motions in Limine" regarding the restriction of Mayeux's testimony and also the low-water mark issues. The plaintiffs stated in opposition:

The State's second motion seeks a ruling that the *only* issue set for hearing is a determination of the ordinary low-water mark of the Little River. To the extent this determination includes both the computation of the ordinary low-water mark and its location in the Catahoula Basin, the Plaintiffs agree. If, however, the State is seeking to exclude the *location* of the ordinary low-water mark of the Little River from the scope of the hearing, the Plaintiffs disagree. It would

make little sense to determine the ordinary low-water mark and not identify the location of that mark in the Catahoula Basin.

On July 22, 2021, LDNR filed a "reply in support of its motion in limine regarding the scope of the August 10, 2021 trial and motion in limine" (regarding expert witness Michael Mayeux). In the memorandum in support of the motions, LDNR sought to limit scope of the August 10, 2021 hearing as follows:

> The August 10, 2021, trial in this matter will be held to determine only the ordinary low-water stage of the Little River in the Catahoula Basin (the area formerly known as Catahoula Lake). The Parties may present evidence relevant to both the computation of the ordinary low-water stage and its location in the Catahoula Basin. The Parties shall not present evidence at the trial as to the location of oil or gas wells or units, the rights of any riparian owners, rights in any mineral interests, or locations of servitude or other real property issues.

The trial court rendered an order on July 22, 2021 stating that:

> It is ordered that the August 10, 2021, trial in this matter will be held to determine only the ordinary low-water stage of the Little River in the Catahoula Basin (the area formerly known as Catahoula Lake). The Parties may present evidence relevant to both the computation of the ordinary low-water stage and its location in the Little River/Catahoula Basin. The parties shall not present evidence at the trial as to the location of oil or gas wells or units, the rights of any riparian owners, rights in any mineral interests, or locations of servitudes or other real property interests.

An order rendered on July 22, 2021 by the trial court stated:

> the August 10, 2021, trial in this matter will be held to determine only the ordinary low-water stage of the Little River in the Catahoula Basin (the area formerly known as Catahoula Lake). The Parties may present evidence relevant to both the computation of the ordinary low-water stage and its location in the Little River/Catahoula Lake.

On July 26, 2021, the plaintiffs' opposition to LDNR's exception of non-joinder was filed into the record. That same day, the plaintiffs also filed a "Peremptory Exception of Res Judicata or Alternative Motion in Limine (with incorporated memorandum of authorities)," urging that LDNR could not limit the

10

evidence, particularly relating to the location of oil and gas wells, that the trial court could consider in determining the low-water mark.[2] The plaintiffs stated:

5.

> While the precise location of the ordinary water mark must be determined, the fact that those wells were on lands belonging to the riparian owners (not the State) *was* determined. Indeed, the royalties-which are part of the final judgment-could *not* have been awarded without a determination that the minerals were produced from wells located on the Class Plaintiffs' land.

Plaintiffs further argued:

10.

> The Court's ruling on the State's motion in limine allows the State to re-litigate issues already decided in the final judgment in this case. Specifically, the Court has now excluded evidence of where the oil and gas wells are located. That evidence is necessary to show that the river bank where those wells are located has already been adjudicated to the Class Plaintiffs in the final judgment in this case. In other words, this land has already been determined to be *outside* of the ordinary low-water mark. Therefore, it cannot be part of the river bed and cannot be owned by the State. At the very least, the land on which the wells are located defines where the river is *not* located.

11.

> The issue of whether the wells are on the Class Plaintiffs land was litigated and determined in the final judgment. It cannot be relitigated. The land where the wells are located has already been determined to be owned by the Class Plaintiffs and not the State-meaning that it is necessarily situated *above* the low-water mark of the Little River. Thus, the low-water mark cannot be moved in any way that reaches an oil or gas well.

On July 29, 2021, the plaintiffs filed an "Opposition to Louisiana Department of Natural Resources' Exception of Nonjoinder." They also filed a "Surreply Brief in Opposition to State Motion in Limine to Restrict Evidence."

An August 2, 2021 judgment filed on August 30, 2021, denied LDNR's exception of nonjoinder.

---

[2] This exception of res judicata is in response to two motions in limine file by LDNR that are not in the record. The exception noted that the trial court had ruled on July 22, 2021 granting LDNR's motion.

On August 6, 2021, LDNR filed a dilatory exception of unauthorized use of a summary proceeding, urging that the August 10, 2021 hearing constituted a boundary action which required ordinary process. On August 9, 2021, the plaintiffs filed an "Opposition to State's Exception of Improper Use of Summary Proceeding."

On August 9, 2021, LDNR filed an "Opposition to for [sic] trial on the ordinary low-water stage," in which it stated that the trial court was competent to determine the ordinary low-water stage and argued that "nothing prevents this Court from considering the evidence and making its own decision on the location of the ordinary low-water stage." This filing appears to be in response to plaintiffs' exception of res judicata. LDNR argued that the location of oil and gas wells is public information and that:

> this issue is just not relevant to any honest and earnest determination of the ordinary low-water stage, and will be a distraction and additional burden at the August 10 trial. . . . It is prejudicial to expect [LDNR] to also now hold a trial on the mineral interests in this case at the same time, particularly after the Court has already ruled that this trial is only to determine the ordinary low-water stage, and evidence of mineral rights and wells will not be part of the trial.

On August 9, 2021, plaintiffs filed a "Motion To Exclude the Testimony of the State's Expert Witnesses or, Alternatively, to Limit Their Testimony." LDNR also filed, on August 9, 2021, a "Pre-Trial Brief for Trial on the Ordinary Low-water Stage," a "Reply to the Class Plaintiffs' Opposition to the State's Exception of Unauthorized Use of a Summary Proceeding," and an "Opposition to Plaintiffs' Motion to Exclude Testimony of the State's Expert Witnesses, or Alternatively, to Limit Their Testimony."

Following a hearing on August 10, 2021, the trial court rendered judgment denying LDNR's exception for unauthorized use of summary proceeding, granting the plaintiffs' exception of res judicata, denying the plaintiffs' motion to exclude/limit the testimony of LDNR's expert witnesses, and found that "the

ordinary low-water mark of the Little River within the Catahoula Basin is 24.08 feet above mean sea level." It further found:

> . . . .the contours of that ordinary low-water mark of 24.08 feet above mean sea level are shown on the surveys prepared by Michael Mayeux and introduced into evidence as Exhibits P-11 and P-12, which are hereby adopted as part of this judgment and attached hereto.

### ASSIGNMENTS OF ERROR

LDNR now appeals and assigns the following errors:

1. The district court erred by improperly trying a boundary action as a summary proceeding.

2. The district court erred by not joining all immoveable property and mineral interest owners whose rights are impacted by the boundary setting.

3. The district court erred by granting the Plaintiffs' exception of *res judicata*, even though the only operative "claim" was the Plaintiffs' own oral motion.

4. The district court erred by denying LDNR a right to present testimony and evidence.

5. The district court erred by applying the law to result in absurd consequences.

6. The district court erred by *post hac* ruling that LDNR's witnesses would be limited to their deposition testimony.

Subsequent to the filing of appeal, LDNR filed "exceptions of lack of subject matter jurisdiction and no cause of action on appeal of the defendant/appellant, the State of Louisiana, Through the Louisiana Department of Natural Resources," essentially claiming sovereign immunity from the plaintiffs' boundary-action claim on appeal and asserting that a low-water mark boundary is ambulatory and unfixable by law. For the following reasons, we deny LDNR's exceptions, affirm in part, and reverse in part.

*Exception of Lack of Subject Matter Jurisdiction*

We will address LDNR's exceptions of lack of subject matter jurisdiction and no cause of action on the merits. LDNR first argues that it is entitled to sovereign immunity relating to the fixing of the low-water mark or, alternatively, that the low-water mark is "ambulatory and unfixable by law" and any claim to fix such a boundary in perpetuity does not state a viable cause of action.

*Lack of Subject Matter Jurisdiction-Sovereign Immunity*

In this exception, LDNR wishes to assert its sovereign immunity from suit sixteen years into the litigation. LDNR claims that "[b]because the Legislature has never waived sovereign immunity from lawsuits to determine ownership or boundaries of public property, the courts do not have subject matter jurisdiction to decide the boundary dispute claim currently on appeal in the matter."

> Subject matter jurisdiction is the legal power and authority of a court to hear and determine a particular class of actions or proceedings, based upon the object of the demand, the amount in dispute, or the value of the right asserted. La. C.C.P. art. 2. A judgment rendered by a court which lacks subject matter jurisdiction is void. La. C.C.P. art. 3.

*Thornhill v. Cypress Black Bayou Recreation and Water Conservation Dist.*, 53,843, pp. 7-8 (La.App. 2 Cir. 4/14/21), 316 So.3d 597, 602, *writ denied*, 21-674 (La. 9/27/21), 324 So.3d 90. An exception to subject matter jurisdiction can be raised at any time. *Canal/Claiborne, Ltd. v. Stonehedge Dev., LLC,* 14-664 (La. 6/20/14), 156 So.3d 627. In *Canal/Claiborne*, the supreme court stated:

> Although not raised in the lower courts, we find the Department's exception of subject matter jurisdiction is properly raised in this court. Louisiana courts have recognized that such an exception may be raised at any stage of the proceedings, including at the appellate level. *Piper v. Olinde Hardware & Supply Co.,* 288 So.2d 626 (La.1974); *Colacurcio v. Ledet,* 94-1798 (La.App. 4 Cir. 9/28/95), 662 So.2d 65. The jurisdiction of a court over the subject matter of an action or proceeding cannot be conferred by consent of the parties. La.Code Civ. Proc. art. 3. Thus, a judgment rendered by a court with no

jurisdiction over the subject matter of the action or proceeding is void. *Id.*

*Id*. at 632.

*Canal/Claiborne* further sets forth the starting point in interpreting constitutional provisions:

> The starting point in the interpretation of constitutional provisions is the language of the Constitution itself. *Louisiana Mun. Ass'n v. State,*00-0374, p. 5 (La.10/6/00), 773 So.2d 663, 667. When a constitutional provision is plain and unambiguous, and its application does not lead to absurd consequences, its language must be given effect. *Id.* at pp. 5-6,773 So.2d at 667. The Louisiana Constitution of 1974 provides, in Article XII, Section 10(A): "Neither the state, a state agency, nor a political subdivision shall be immune from suit and liability in contract or for injury to person or property." This court has recognized Section 10(A) as an "unequivocal, self-executing waiver of sovereign immunity as to suit and liability in contract and tort cases." *Fulmer v. State, Dept. of Wildlife and Fisheries,*10-2779 (La.7/1/11), 68 So.3d 499, 503(quoting *Jacobs v. City of Bunkie,* 98–2510 (La.5/18/99), 737 So.2d 14, 22). This language is clear and unambiguous, and we need not rely on the constitutional debates to infer any qualifications in that waiver.

*Id*. at 632.

The basis for the LDNR's assertion of sovereign immunity is the same provision relied upon in *Canal/Claiborne*: Louisiana Constitution Article 12, § 10, which states in pertinent part:

> (A) No Immunity in Contract and Tort. Neither the state, a state agency, nor a political subdivision shall be immune from suit and liability in contract or for injury to person or property.

> (B) Waiver in Other Suits. The legislature may authorize other suits against the state, a state agency, or a political subdivision. A measure authorizing suit shall waive immunity from suit and liability.

It is elemental that due process rights of the United States and Louisiana Constitutions demand the protection of private property rights from unwarranted governmental intrusion. Louisiana Constitution Article 1, § 2 states: "No person shall be deprived of life, liberty, or property, except by due process of law." Louisiana Constitution Article 1, § 4 states in part:

15

Section 4. (A) Every person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property. This right is subject to reasonable statutory restrictions and the reasonable exercise of the police power.

(B)(1) Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit. Except as specifically authorized by Article VI, Section 21 of this Constitution property shall not be taken or damaged by the state or its political subdivisions: (a) for predominant use by any private person or entity; or (b) for transfer of ownership to any private person or entity.

A waiver of sovereign immunity cannot be implied; it is strictly construed. *West Jefferson Med. Ctr. Med. Staff ex rel. Boraski v. State*, 11-1718 (La.App. 1 Cir. 4/16/13), __ So.3d __ (*unpublished opinion*). However, LDNR does not enjoy sovereign immunity from self-executing constitutional commands such as that found in Art. 1, § 4 of the Louisiana Constitution. In *Avenal v. State*, 03-3521, p. 26 (La. 10/19/04), 886 So.2d 1085, 1103-04, *cert. denied*, 544 U.S. 1049, 125 S.Ct. 2305 (2005)(footnote omitted), the Louisiana Supreme Court reviewed the law relating to self-executing causes of action for inverse condemnation:

In *Chambers,* we recognized that "our constitution requires compensation even though the State has not initiated expropriation proceedings in accordance with the statutory scheme set up for that purpose." 595 So.2d at 602. This "inverse condemnation" action "provides a procedural remedy to a property owner seeking compensation for land already taken or damaged against a governmental or private entity having the powers of eminent domain where no expropriation has commenced." *Id.* Inverse condemnation claims derive from the Takings Clauses contained in both the Fifth Amendment of the U.S. Constitution and Art. I, § 4 of the Louisiana Constitution. "The action for inverse condemnation is available in all cases where there has been a taking or damaging of property where just compensation has not been paid, without regard to whether the property is corporeal or incorporeal." *Id.* (Cites omitted.) The constitutional command of Art. I, § 4 is self-executing, such that the cause of action arises whenever a state commits a taking without justly compensating the victim. *Id.*

The supreme court in *Crooks*, __So.3d at __, affirmed that the constitutional command of Art. I § 4 is self-executing, "such that the cause of action arises

whenever a state commits a taking without justly compensating the victim." Other courts of this state have confirmed the supreme court's holding authorizing the self-executing nature of an inverse condemnation claim even though "the legislature has not provided a procedure whereby an owner can seek damages for an uncompensated taking or damaging[.]" *St. Tammany Parish Hosp. Serv. Dist. No. 2 v. Schneider,* 00-247, p. 6 (La.App. 1 Cir. 5/11/01), 808 So.2d 576, 582. Moreover, the legislature has provided the award of attorney fees in inverse condemnation matters. The court in *St. Tammany* noted,

> Although the measures and mechanisms for providing compensation to the full extent of the loss are still being developed by the jurisprudence, the entire body of law related to this subject presumes that property was taken or damaged by: (1) an expropriation action that proceeded to final judgment in favor of the expropriating entity; or (2) an uncompensated taking after which a property owner brought an inverse condemnation action resulting in a judgment in favor of the property owner.

*Id.* at 583.

In *St. Tammany*, there was no judgment in favor of the property owner because it dismissed its expropriation suit. Therefore, no damages in the form of lost rentals were allowed unless the State acted in bad faith or abused its appropriation powers.

LDNR argues that a boundary action is neither a suit in contract nor in tort and that it is not authorized under any other constitutional or statutory provision and therefore plaintiffs had to obtain a specific legislative waiver of sovereign immunity in order to file a boundary claim. LDNR characterizes the proceedings as an "ownership determination."

In *Crooks*, __ So.3d at __, the supreme court noted that the "it is well settled that '[t]he taking of property, by flooding or otherwise, without proper exercise of eminent domain, is not a tort but is considered an appropriation." It reversed a panel of this court's finding that the inverse condemnation was a continuing tort. *Id.*

17

While the inverse condemnation claim was found to be prescribed, the plaintiffs' cause of action for the appropriated mineral interests and future mineral royalties was not. The unlawful taking of the plaintiffs' mineral interests arose out of the inverse condemnation, or the uncompensated taking of the plaintiffs' property.

LDNR relies on *Two O'Clock Bayou Land Co., Inc. v. State of La.*, 415 So.2d 990 (La.App. 3 Cir. 1982), for the proposition that ownership disputes are subject to sovereign immunity unless a legislative waiver has been granted. In *Two O'Clock,* a landowner sued the state seeking a declaratory judgment that it owned the bed and bayou of a certain area of land. Citing La.Const. art. 12, §10, a panel of this court held that "suits against the State to determine ownership of land [were not] included in its waiver of sovereign immunity from suits in contract or injury to property." *Id.* at 992. Instead, it considered that such actions were within the classification of "other suits" mentioned in subsection (b), which require legislative authorization for institution." *Id.* The court granted the exception of sovereign immunity in favor of the state. However, the court noted:

> The nature and effect of the present declaratory judgment suit, like a petitory action, is to determine the title and ownership of land. It is not one for damages which may have arisen from the breach of any contract with the State nor for the specific performance thereof.
>
> Nor is this a suit for the value of any property taken or appropriated by the State. Such question can only arise after the title and ownership of the bed of the stream is determined.

*Id*. at 993.

We find the present case distinguishable as its origination is in inverse condemnation rather than just a declaration of ownership (a petitory action). The constitutional command of Article 1, § 4 requires no legislative authorization to sue and, LDNR does not enjoy sovereign immunity under these circumstances. The exception of lack of subject matter jurisdiction is denied.

*No Cause of Action*

If that argument fails, LDNR argues that the plaintiffs have failed to assert a cause of action because a permanent boundary cannot be determined, as waterway boundaries are ambulatory and non-fixable. The supreme court addressed the law pertaining to exceptions of no cause of action when LDNR asserted a no cause of action for the first time at the supreme court level in *Crooks*, __ So.3d at __:

> As used in the context of a peremptory exception, a "cause of action" refers to the operative facts which give rise to the plaintiff's right to judicially assert an action against the defendant. *MAW Enterprises, L.L.C. v. City of Marksville*, 2014-0090, p. 6 (La. 9/3/14), 149 So. 3d 210, 215, *citing Scheffler v. Adams and Reese*, *LLP*, 2006-1774, p. 4 (La. 2/22/07), 950 So. 2d 641, 646; *Everything on Wheels Subaru, Inc. v. Subaru South, Inc.*, 616 So. 2d 1234, 1238 (La. 1993). The peremptory exception of no cause of action is designed to test the legal sufficiency of the petition by determining whether the plaintiff is afforded a remedy in law based on the facts alleged in the pleading. *Fink v. Bryant*, 01-0987, pp. 4-6 (La. 11/28/01), 801 So. 2d 346, 349-50; *Louisiana Paddlewheels v. Louisiana Riverboat Gaming Commission*, 94-2015 (La. 11/30/94), 646 So.2d 885. The exception is triable on the face of the pleadings and for the purposes of determining the issues raised by the exception, the well-pleaded facts in the petition must be accepted as true. *Vince v. Metro Rediscount Company, Inc.*, 2018-2056 (La. 2/25/19), 264 So. 3d 440; *City of New Orleans v. Board of Commissioners,* 93-0690 (La. 7/5/94), 640 So.2d 237. All reasonable inferences are made in favor of the nonmoving party in determining whether the law affords any remedy to the plaintiff. La. C.C. P. arts. 927, 931; *Mayer v. Valentine Sugars, Inc.,* 444 So.2d 618 (La. 1984). The burden of showing that the plaintiff has stated no cause of action is upon the exceptor. *City of New Orleans v. Bd. of Directors of Louisiana State Museum*, 98-1170, pp. 9-10 (La. 3/2/99), 739 So. 2d 748, 755-56.

> Generally, under La. C. C. P. art. 931, no evidence may be introduced to support or controvert the exception of no cause of action. *MAW Enterprises, L.L.C.*, 2014-0090 at 7, 149 So. 3d at 215. However, an exception to this rule has been recognized by the jurisprudence, and a court may consider evidence admitted without objection to enlarge the pleadings. *Id.,* citing *City of New Orleans*, 98-1170 at 10, 739 So. 2d at 756. Thus, where, as here, the exception has been raised for the first time after trial on the merits, a determination by this court of whether the plaintiff may maintain a cause of action against the defendant may be made by a review of all the facts supported by the record. See *id.* A court appropriately sustains the peremptory exception of no cause of action only when, conceding the correctness of the facts, the plaintiff has not stated a claim for which he or she can receive legal

remedy under the applicable substantive law. *Id.; Industrial Companies, Inc. v. Durbin*, 2002-0665, p. 7 (La. 1/28/03), 837 So. 2d 1207, 1213.

LDNR argues its exception is:

based on the plain language of the Louisiana Civil Code and existing jurisprudence, thus requiring no evidence from the record for its support. Pursuant to LA.C.C. art. 456 (in pertinent part), [t]he bank of a navigable river or stream is the land lying between the ordinary low and the ordinary high stage of the water.

We have reviewed the entire record of this case. First LDNR claimed it did not have enough time to determine the low-water mark, then it arrived at a low-water mark of 28 feet, and now it claims the low-water mark cannot be determined because it is ambulatory and non-fixable. While we do not doubt that the low-water is subject to fluctuation, a low-water mark based on an average of the low-water over an extended period of time is a method used by experts in determining a boundary for legal purposes.

LDNR had its chance to provide expert testimony as to the alleged ambulatory and unfixable nature of the low-water mark on August 10, 2021, yet it did not do so. The time to advance this argument has long since passed. Plaintiffs' petition sets forth a valid claim to determine the low-water mark boundary. Accordingly, LDNR's exception of no cause of action is denied.

### Boundary Action

LDNR argues that an action to set a low-water stage is a boundary action which must be via an ordinary proceeding, and the boundary dispute is not a mere incidental question. The plaintiffs, on the other hand, argue that the issue of the low-water mark is merely incidental to the supreme court's judgment affirming the finding that Catahoula Basin is actually a river.

The Louisiana Code of Civil Procedure is quite clear when it comes to the type of proceeding required for a boundary action: "An action to fix the boundary is an ordinary proceeding." La.Code Civ.P. art. 3691.

The setting of a low-water mark is a boundary action with significant consequences:

> As to navigable rivers and streams, the State still holds in its sovereign capacity all the land below the ordinary low-water mark, but the banks (the areas between the ordinary low-water and ordinary high-water marks) now belong to the riparian landowners. LSA-C.C. arts. 450, 456; *State v. Placid Oil Co.*, 300 So.2d at 173. As to lakes, however, the State still holds the land all the way up to the ordinary high-water mark.

*McCormick Oil & Gas Corp. v. Dow Chem. Co.*, 489 So.2d 1047, 1049 (La.App. 1 Cir. 1986).

All parties concede that the timeline from the June hearing to the one-day trial on August 10, 2021 was without ordinary trial delays and was, therefore, summary in nature. Plaintiffs even phrase their argument in brief as "[t]he ordinary low-water mark was an 'incidental' issue that was properly tried in a summary proceeding." Plaintiffs characterize these proceedings as "incidental" to the supreme court's remand. First, the supreme court did not remand the case for any proceedings. It rendered a final judgment that did not address the boundary issue or remand for a determination of the boundary issue.

Second, plaintiffs use of the term "incidental" confuses the nature of the proceedings because summary proceedings are only for those issues expressly designated by law such as incidental questions, including the award of attorney fees. La.Code Civ.P. art. 2592. Louisiana Code of Civil Procedure Article 2592 sets forth when summary proceedings can be used:

> Summary proceedings may be used for trial or disposition of the following matters only:

(1) An incidental question arising in the course of judicial proceedings, including the award of and the determination of reasonableness of attorney fees.

(2) An application for a new trial.

(3) An issue which may be raised properly by an exception, contradictory motion, or rule to show cause.

(4) An action against the surety on a judicial bond after judgment has been obtained against the principal, or against both principal and surety when a summary proceeding against the principal is permitted.

(5) The homologation of a judicial partition, of a tableau of distribution or account filed by a legal representative, or of a report submitted by an auditor, accountant, or other expert appointed by the court; and an opposition to any of the foregoing, to the appointment of a legal representative, or to a petition for authority filed by a legal representative.

(6) A habeas corpus, mandamus, or quo warranto proceeding.

(7) The determination of the rank of mortgages, liens, and privileges on property sold judicially, and of the order of distribution of the proceeds thereof.

(8) The original granting of, subsequent change in, or termination of custody, visitation, and support for a child; support for a spouse; injunctive relief; support between ascendants and descendants; use and occupancy of the family home or use of community movables or immovables; or use of personal property.

(9) An action to compel an accounting at termination of parental authority; and an action to seek court approval to alienate, encumber, or lease the property of a minor, to incur an obligation of a minor, or to compromise the claim of a minor.

(10) An action to annul a probated testament under Article 2931.

(11) An action to enforce the right to a written accounting provided for in R.S. 9:2776.

(12) An action for dissolution or specific performance of a compromise entered pursuant to Article 1916(B) or by consent judgment.

(13) All other matters in which the law permits summary proceedings to be used.

Plaintiffs argue in brief:

What could be more "incidental" to these proceedings than identifying and locating the ordinary low-water mark as mandated by the final judgment in this case? Were it not for the final judgment, there would be no reason to identify or locate the ordinary low-water mark. By definition, that issue is "incidental" to the course of these proceedings."

Plaintiffs set forth various examples of summary proceedings after a final judgment has been rendered that do not relate to the setting of a boundary. We agree with LDNR that a boundary determination cannot be by summary proceedings. Moreover, the setting of a property boundary, as a matter of law, is simply not an "incidental" question. If it were, the code would not require that it be heard by ordinary proceedings. *See* La.Code Civ.P. art. 3691. While the setting of the boundary may be a natural consequence of the prior ruling determining that the waterway is a river, it is not an incidental matter under La.Code Civ.P. art. 2592.

In 1 La.Civ.L. Treatise, Civil Procedure §5:3 (2d ed.)(citations omitted), Frank L. Maraist has noted how the confusion can arise:

The summary proceeding, as described in the Code, encompasses two separate concepts: (1) a summary proceeding by which the parties obtain a trial on the merits without the formalities and delays of the ordinary proceeding, and (2) a summary procedure which is used to determine incidental issues arising in the course of an ordinary, executory, or summary proceeding. Unfortunately, the Code uses the term "summary proceeding" to describe both concepts.

We find that these proceedings were not a "summary proceeding." While this portion of the litigation was by "summary procedure," the trial of the low-water mark determination was merely a continuation of the ordinary proceedings instituted in 2006 when the initial petition stated it was a "class action petition to fix boundary." The petition states (emphasis added):

## FIRST CAUSE OF ACTION TO FIX BOUNDARY

7.

Plaintiffs and the members of the class own property along the banks of Little River or its tributaries, which are situated within Rapides, LaSalle, Grant and Catahoula Parishes.

8.

The State of Louisiana is the owner of the bed and bottom of Little River and its tributaries. Plaintiffs and the members of the class are the riparian owners of the banks of Little River and its tributaries and their property *is bounded by the mean low-water mark* of Little River and its tributaries.

9.

*The boundaries (i.e. the mean lower water mark of Little River and its tributaries")* separating plaintiffs and the members of the class properties from the bed and bottom of Little River and its tributaries owned by the State has never been fixed and/or established.

. . . .

11.

In fact, the "Catahoula Basin, is owned by plaintiffs, the riparian landowners adjacent to Little River and/or its tributaries *through the mean low-water mark* and a bare minimum, the "Catahoula Basin" is the bank of Little River or the bank of one of its tributaries, and is, therefore, owned by the riparian owners who are plaintiffs and the members of the class. The boundary between the property of the members of the class and the bed and bottom of Little River or its tributaries owned by the State *should be set at the mean low-water mark of these streams.*

The ordinary proceeding instituted in 2006 gave notice that the setting of the low-water mark boundary was a central claim of the class action. This is an ongoing matter bearing the same docket number today as it has since its inception.

LDNR was served with the citation and has long known that the fixing of the low-water mark boundary would be an issue. In brief, LDNR attempts to distinguish the setting of the boundary from the exact location of the low-water mark. It states:

24

The trial court did in fact set the boundary at the ordinary low in the same judgments classifying the waterway as a river in 2016 and 2017. However, the specific location of that boundary, which is by law ambulatory and unfixable, had never been prayed for, pled, or set at any time before June 4, 2021. The original trial court *heard no evidence* on the exact location of the ordinary low throughout the proceedings.

We find this distinction irrelevant from the standpoint of a pleading. There is no purpose in setting a boundary without delineating its location. Moreover, the petition clearly prayed for the setting of the exact low-water mark. LDNR, by its own admissions and motions over the years as noted in the factual summary, has known that the low-water mark boundary would need to be determined. While LDNR states the focus of the previous years of litigation related only to the lake versus river issue, based on the original pleadings and the subsequent litigation, it would be unreasonable for LDNR to not anticipate that the boundary setting was forthcoming. LDNR had many years to prepare for this issue. At the very least, in June 2020 (over a year before the June 4, 2021 hearing setting the boundary matter for trial on August 10, 2021), LDNR knew that the boundary determination was imminent when plaintiffs filed their motion "regarding remand matters." LDNR had sufficient notice and time to gather evidence and testimony of expert witnesses pertaining to the low-water mark boundary. Accordingly, we find no error in the trial court's denial of the LDNR's exception of improper use of summary proceedings. This assignment of error is without merit.

*Joinder*

LDNR argues that all immovable property owners whose property will be changed by the setting of the ordinary low boundary must be joined before a trial to set the boundaries can commence.

25

At the hearing, LDNR argued that the federal government had never been served and that there are others affected such as mineral interest owners who are not landowners.

In brief, LDNR argues that the United States is the largest riparian owner in the Catahoula Basin and that Tensas Delta Exploration Company, L.L.C., who is not a party in the matter, claims all mineral interests under both the federal and state properties through various mineral leases, "making it the largest mineral rights holder in the Catahoula Basin." LDNR states that while the United States may have opted out of the class action, "it did not opt out of its immovable property interests." LDNR further argues that mineral rights holders who are not landowners were never class members and must be joined before their property boundaries are changed. LDNR opines that the "opt-out" plaintiffs, including Saline Hunt Club, Church and Charity, Inc, and the Louisiana Department of Wildlife and Fisheries must be joined before their riparian boundaries are changed. It further argues that "just because someone chose to opt out of joining a class-action lawsuit, that does not mean they are unaffected by a judgment setting their property boundaries." Finally, LDNR states that the absence of these parties renders the August 2021 judgment null.

On appeal, we review the trial court's denial of an exception of non-joinder using the abuse of discretion standard. *Foster v. City of Leesville,* 17-1106 (La.App. 3 Cir. 6/13/18), 250 So.3d 302. In La.Code Civ.P. art. 641, joinder of parties needed for just adjudication is addressed:

A person shall be joined as a party in the action when either:

(1) In his absence complete relief cannot be accorded among those already parties.

(2) He claims an interest relating to the subject matter of the action and is so situated that the adjudication of the action in his absence may either:

26

(a) As a practical matter, impair or impede his ability to protect that interest.

(b) Leave any of the persons already parties subject to a substantial risk of incurring multiple or inconsistent obligations.

A panel of this court recently addressed joinder of parties needed for just adjudication:

> In *Two Canal Street Investors, Inc. v. New Orleans Building Corp.*, 16-825 (La.App. 4 Cir. 9/23/16), 202 So.3d 1003, 1011-12 (citation omitted), the court observed that pursuant to Article 641: "Parties needed for just adjudication in an action are those who have an interest relating to the subject matter of the action and are so situated that a *complete and equitable adjudication of the controversy* cannot be made unless they are joined in the action." The court continued, noting: "A person should be deemed to be needed for just adjudication *only when absolutely necessary to protect substantial rights*." *Id*. at 1012. When considering whether a party is needed, the court must conduct "an analysis of the interests of the joined and nonjoined parties" and determine whether the action can proceed to judgment. *Lowe's Home Constr., LLC v. Lips*, 10-762, p. 6 (La.App. 5 Cir. 1/25/11), 61 So.3d 12, 16; *writ denied*, 11-371 (La. 4/25/11), 62 So.3d 89.

*Johnson v. Strange*, 21-12, p. 4 (La.App. 3 Cir. 6/9/21), 323 So.3d 444, 446 (emphasis added).

Moreover, the facts, rather than allegations, must leave no doubt that complete relief cannot be accorded without the joinder of the parties alleged by the exceptor:

> The jurisprudence of this state holds that a party is indispensable *only when the facts clearly establish* that no complete and equitable adjudication of the controversy can be made in his absence. *State v. Lamar Advertising Co.,* 279 So.2d 671 (La.1973). Because of the lack of evidence in the record, a factual analysis of the rights of the parties and absent persons could not have been made.
>
> The burden of proving an exception is on the party asserting it. *Town of Grand Isle v. Dynamic Constructors, Inc.,* 374 So.2d 703 (La.App. 1st Cir.1979).

*Carter v. Baton Rouge City-Parish Employees' Ret. Sys.*, 612 So.2d 765, 767 (La.App. 1 Cir. 1992).

27

The absence of a necessary party results in an absolute nullity, and we must remand the matter for retrial once the absent party has been joined. *Johnson*, 323 So.3d 444.

In its reply brief, LDNR states:

> And while the federal government and other opt-out plaintiffs did not want to be part of the class, they did not opt out of their property rights. When the United States opted out years ago, it did so *without knowing that the Class Plaintiffs would someday ask to reset boundaries on its properties without informing it.*

We disagree. This argument also rests on the underlying premise that LDNR and/or the other opt-out plaintiffs could not anticipate that a boundary determination would result from the class action petition which sought to "Fix Boundary, For Damages and For Declaration [sic] Judgment."

In May 2014, LDNR filed a joint motion with the plaintiffs to permit the Catahoula National Wildlife Refuge and the U.S. Fish and Wildlife Service to "opt-out" out of the class, which was granted by the trial court. These parties will not now be forced to join in the litigation. Regarding the mineral interest owners, particularly Tensas Delta who, according to LDNR, owns more mineral interests than anyone else in the Catahoula Basin, we are certain that a sophisticated party of this nature would be well aware of the lengthy litigation over an area in which it has a significant financial interest. More importantly, the absence of Tensas Delta from the litigation fifteen years into the litigation has no effect on the class members achieving complete relief. La.Code Civ.P. art. 641(1). Assuming the accuracy of LDNR's allegations, Tensas Delta has other remedies at law that it can pursue if necessary.

Finally, as to any other parties that LDNR claims should be joined, "[a] definitive judgment on the merits rendered in a class action concludes all members of the class, whether joined in the action or not, if the members who were joined as

parties fairly insured adequate representation of all members of the class." La.Code Civ.P. art. 597. Accordingly, we find the trial court did not abuse its discretion in denying the exception of non-joinder, and this assignment of error is without merit.

*Res Judicata*

In this assignment of error, LDNR argues the trial court's grant of plaintiffs' peremptory exception of res judicata was procedurally erroneous. We agree.

The first issue addressed at the August 10, 2021 hearing was a motion in limine to limit the testimony of a Michael Philip Mayeux, a surveyor. The plaintiffs argued that "it is a matter of res judicata that the bank, the low bank, cannot be higher than the lowest of those oil well elevations." LDNR argued that the oil well locations were not relevant to the ordinary low-water mark. The trial court ruled:

> Well, with regard to any evidence of oil and gas wells or units, if it's not necessary in determining the low-water mark, then I don't need to hear it. I'm here today for one purpose, that's to determine the low-water mark.

Thereafter, the trial court granted the plaintiffs' exception of res judicata and again stated it would only be determining the low-water mark.

"An exception is a means of defense, other than a denial or avoidance of the demand, *used by the defendant*, whether in the principal or an incidental action, to retard, dismiss, or defeat the demand brought against him." La.Code Civ.P. art. 921 (emphasis added). "The function of the peremptory exception is to have the plaintiff's action declared legally nonexistent, or barred by effect of law, and hence this exception tends to dismiss or defeat the action." La.Code Civ.P. art. 923. The purpose of a peremptory exception of res judicata is to bar relitigation of a matter determined in a previous lawsuit. We recently summarized the law pertaining to res judicata in *McCalmont v. McCalmont*, 19-738, pp. 6-8 (La.App. 3 Cir. 4/29/20), 297 So.3d 1057, 1063-64:

29

"The standard of review of a peremptory exception of *res judicata* requires an appellate court to determine if the trial court's decision is legally correct." *Fletchinger v. Fletchinger,* 10-0474, p. 4 (La.App. 4 Cir. 1/19/11), 56 So.3d 403, 405. "[T]he doctrine of *res judicata* is *stricti juris* and, accordingly, any doubt concerning the applicability of the principle must be resolved against its application." *Id.,* at 406.

*Res Judicata*

"An exception is a means of defense, other than a denial or avoidance of the demand, used by the defendant, whether in the principal or an incidental action, to retard, dismiss, or defeat the demand brought against him." La.Code Civ.P. art. 921. "The function of the peremptory exception is to have the plaintiff's action declared legally nonexistent, or barred by effect of law, and hence this exception tends to dismiss or defeat the action." La.Code Civ.P. art. 923. The exception of *res judicata* is properly raised as a peremptory exception. La.Code Civ.P. art. 927(A)(3). "The peremptory exception may be pleaded at any stage of the proceeding in the trial court prior to a submission of the case for a decision and may be filed with the declinatory exception or with the dilatory exception, or both." La.Code Civ.P. art. 928(B). "On the trial of the peremptory exception pleaded at or prior to the trial of the case, evidence may be introduced to support or controvert any of the objections pleaded, when the grounds thereof do not appear from the petition." La.Code Civ.P. art. 931. If the grounds of the peremptory exception cannot be removed by amending the petition, the claims shall be dismissed. La.Code Civ.P. art. 934.

Res judicata promotes the dual purposes of judicial efficiency and the final resolution of disputes by preventing needless relitigation. *Terrebonne Fuel & Lube, Inc. v. Placid Refining Co.*, 95-0654 (La. 1/16/96), 666 So.2d 624. Louisiana Revised Statutes 13:4231 states:

> Except as otherwise provided by law, a valid and final judgment is conclusive between the same parties, except on appeal or other direct review, to the following extent:
>
> (1) If the judgment is in favor of the plaintiff, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and merged in the judgment.
>
> (2) If the judgment is in favor of the defendant, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and the judgment bars a subsequent action on those causes of action.

> (3) A judgment in favor of either the plaintiff or the defendant is conclusive, in any subsequent action between them, with respect to any issue actually litigated and determined if its determination was essential to that judgment.

"'The burden of proof is upon the pleader to establish the essential facts to sustain the plea of res judicata.'" *Mundell v. Mundell,* 03-631, p. 2 (La.App. 3 Cir. 11/5/03), 858 So.2d 768, 770 (quoting *Ins. Assocs., Inc. v. Francis Camel Constr., Inc.,*95-1955 (La.App. 1 Cir. 5/10/96), 673 So.2d 687); *see also Louisiana Workers' Comp. Corp. v. Betz,* 00-0603, p. 3 (La.App. 4 Cir. 4/18/01), 792 So.2d 763, 765. If "all essential elements are present and each necessary element has been established beyond all question," *res judicata* may be invoked. *Id.* Moreover, the res judicata doctrine must be strictly construed, and any doubt concerning its applicability is resolved against the party raising the objection. *Berrigan v. Deutsch, Kerrigan & Stiles, LLP*, 01-0612 (La.App. 4 Cir. 1/2/02), 806 So.2d 163,*writs denied*, 02-338, 02-341 (La. 4/12/02), 813 So.2d 410.

We find it was procedurally inappropriate for the plaintiffs to file an exception of res judicata in this matter. The plaintiffs' reasons for filing it were:

> Out of an abundance of caution, the class plaintiffs filed an exception of res judicata or, alternatively, motion in limine in the trial court after remand. They did so to avoid re-litigating any issues that were settled in the final judgment, as well as to pre-empt any claim by the State that they had in any way waived *res judicata* by failing to assert it.

Plaintiffs go on to state that the ruling granting the exception "caused no harm." The relationship of the exact location of the low-water mark to the location of gas wells has not been litigated. While the former trial court did, in fact, award the plaintiffs $4,694,309.68 in mineral interests attributable to mineral production from May 2003 through the date of trial, it made no finding as to the location of the gas wells in relation to the low-water mark. As LDNR points out, the location of the oil and gas wells is a matter of public record.

While plaintiffs strenuously argue that we must necessarily find that these wells are above the low-water mark, there is simply insufficient evidence in the record to make such a determination. The low-water mark boundary and the location

31

of the oil and gas wells are two separate independent findings that may or may not correlate. We have combed through the entire record in this case to determine if the former trial court made any findings regarding the low-water mark based on scientific evidence and the location of gas wells. We simply cannot find any evidence in the record of such a finding. While we do not disagree that the legal conclusion must be that the profit from the wells already awarded was above the yet-to-be-determined low-water mark, we cannot substitute that legal finding for the scientific one that establishes the *actual* low-water mark, the sole reason for the August 10, 2021 hearing.[3]

Moreover, in reading through the transcript relating to the exception of res judicata filed by plaintiffs, we are unsure upon what grounds the trial court based its grant of the exception. Plaintiffs' exception was combined with a motion in limine to limit the testimony of some of LDNR's witnesses. Initially, the trial court declared it would deal with those issues as they arose. Then, at the end of the hearing, it granted the exception of res judicata without discussion. Nor did it provide written reasons for judgment. The trial court made it very clear it was uninterested in the location of oil and gas wells and was only going to be determining the location of the low-water mark. Accordingly, we find the trial court legally erred in granting plaintiffs' exception of res judicata.

### Evidence-Assignments four and six

In assignments of error four and six, LDNR argues the trial court erred in prohibiting testimony and evidence at the summary proceeding because it was not disclosed during discovery and the trial court systematically and consistently

---

[3] Undoubtedly, the previous award of mineral interests is *res judicata* as all parties conceded that that final judgment has not been appealed and no party is relitigating that finding in the current proceedings.

prevented the presentation of almost all of LDNR's testimony and evidence. LDNR argues that the trial court misapplied *Daubert* and excluded any evidence that was contrary to the plaintiffs' theory of the case.

The trial court addressed the plaintiffs' motion to exclude witness testimony by LDNR's experts. The plaintiffs argued none of these witnesses would be able to testify as to the location of the low-watermark, claiming they were still "working on it." The plaintiffs noted that LDNR did not even contact some of the witnesses until five weeks after the June 4, 2021 hearing that set the August 10, 2021 trial date. LDNR, on the other hand, argued that since these were summary proceedings there was no deadline for expert reports and they were not due and the witnesses were now ready to testify. LDNR stated:

> And some of the things they may not quite have finished, because they had a very limited amount of time, even yet today. But they can present to this Court the work that they have done. Their information and their expertise to help this Court understand what is happening out there and where the ord – and where the water ordinarily sits during the low season.

The trial court did not exclude the witnesses at the start of the hearing, instead stating it would listen to the witnesses "in light of their deposition testimony, and make rulings." As the hearing continued, none of LDNR's witnesses would testify as to an exact low-water mark. The trial court excluded the testimony of the LDNR's final witness, William Finley, whose testimony was thereafter proffered for the record.

Louisiana Code of Evidence Article 702 governs the admissibility of expert testimony in pertinent part:

> A. A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(1) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(2) The testimony is based on sufficient facts or data;

(3) The testimony is the product of reliable principles and methods; and

(4) The expert has reliably applied the principles and methods to the facts of the case.

A trial court has vast discretion in determining the admissibility of evidence. *See* La.Code Civ.P. art. 1631; *Wood v. Am. Nat. Prop. & Cas. Ins. Co.*, 07-1589 (La.App. 3 Cir. 12/23/08), 1 So.3d 764. We find the trial court did not err in excluding the testimony of LDNR's witnesses, who all admitted they could not give an elevation representing the low-water mark, the sole reason for the hearing. While the trial court did not conduct a traditional *Daubert* style analysis, it did so informally and found that none of LDNR's witnesses would be helpful in determining the issue at hand. While the witnesses did testify to an actual low-water mark number later in the day, the trial court cannot be faulted because of LDNR's witnesses' sudden knowledge after the hearing. It was clear at the hearing that none of LDNR's witnesses were going to testify to an actual low-water mark, that they had insufficient knowledge to testify to an actual low-water mark, and that they did not set forth any methodologies to determine a low-water mark.

LDNR makes vague arguments on appeal that appear to claim that had its witnesses been allowed to testify, they would have proven either that the low-water mark was at 28 feet or that the low-water mark is insusceptible of determination due to a variety of conditions. Without stating the obvious conundrum of these diametrically opposed claims, LDNR's various allegations are unsupported by any testimony of its witnesses, who failed to assist the trier of fact in making these conclusions.

A review of the testimony at the hearing and the proffered evidence makes clear that the trial court did not abuse its discretion, and that the admission of the evidence would not have changed the outcome of the trial court's ruling. Further, in the interest of justice and in an effort to dispel any notion that the LDNR was deprived of its right to present evidence, we will review all of LDNR's proffered testimony. *See* Uniform Rules-Courts of Appeal, Rule 1-3; *Waller v. Wal-Mart Stores, Inc.*, 563 So.2d 1346 (La.App. 4 Cir.), *writ denied*, 568 So.2d 1059 (La.1990). The following testimony and evidence was gathered through depositions preceding the hearing, testimony at the hearing, and proffered testimony following the hearing:

### *Plaintiffs' Witnesses*

### *Dr. Joseph Suhayda*

Dr. Suhayda testified that he has a bachelor's degree in physics and a PhD in physical oceanography. He is retired from teaching at LSU. He testified that his expertise is in coastal processes, including the land, land features, which are lakes and rivers, and also the nursery area where oil platforms are located and ports are developed. He defined coastal hydrology as the application of the principles of physics to the study and modeling of coastal processes, in this particular case, water-related processes including currents, waves, and water level change. Dr. Suhayda has testified as an expert for the State of Louisiana. He testified in the 2015 trial of this matter and was tendered as an expert in hydrology, including the movement of water and flooding. Dr. Suhayda admitted this was the first time he applied his physics background and experience in determining the low-water mark, although he had done quite a bit of work in determinations of the ordinary high-water mark. The trial court accepted Dr. Suhayda as an expert in the field of hydrology, including the movement of water and flooding.

Dr. Suhayda determined the low-water mark to be 24.08 feet. He used a methodology involving the average of the measurements of the annual low-water elevation over a sufficient period of time. The measurements are computed from gauges that the Army Corps of Engineers routinely uses to measure water level activity in waterways. In the Catahoula Basin, there are three gauges. Dr. Suhayda did not use readings from two of the gauges because one was too far away from the subject area and the other gauge was located at surface level and did not measure low-water level conditions. Moreover, these two gauges only provided twenty years of data, which Dr. Suhayda deemed insufficient.

Dr. Suhayda relied on the gauge located at the Diversion Canal Control Structure because it measures water levels at the structure in the diversion canal. The Diversion Canal is directly connected to Little River and the hydraulic connectivity is excellent. Dr. Suhayda testified that this gauge was installed in 1973 specifically to measure water levels in the Little River, and the gauge was continuously operated through 2020 at the point when he used the data. Thus, Dr. Suhayda had forty-eight-years-worth of data to work with in determining the low-water mark. Dr. Suhayda used the lowest water elevation reading for each of the 48 years to determine the ordinary low-water mark. The average annual low-water was computed by summing the annual low-water measurements for the 48 years and then dividing by 48 or, in other words, the sum of all the information divided by the total number of observations.

On cross examination, Dr. Suhayda was asked about whether he took stream slope into consideration, given that the location of the gauge was a mile-and-a-half from the Little River. Dr. Suhayda testified that he did not include it because he did not believe it could be taken at face value.

*Michael Philip Mayeux*

Mayeux, a licensed registered land surveyor for 37 years, testified that he locates real property on the ground, determines elevations of the ground and records measurements, and prepare plats. He further stated that he determines elevations of the ground and bottoms of water bodies, which is known as topographic (land) or hydrographic (water) surveying. Mayeux testified that he has been recognized as an expert in many courts, and has testified for the State of Louisiana about ten times, even determining the low-water mark in one case. He testified as an expert in this case at the 2015 trial. Mayeux performed a hydrographic survey to identify the location of the ordinary low-water mark. Mayeux agreed with the methodology employed by Dr. Suhayda. Mayeux had previously found that the ordinary low-water mark of the Little River was 25.32 feet based on the data from 1972 through 2013. However, Mayeux testified that he made a calculation error and that Dr. Suhayda's figure was the same he arrived at after using the correct column of figures. Mayeux surveyed the area by boat over the course of 7 days in mid-July 2021.

*LDNR's Witnesses*

*Deposition Testimony of Dr. George Losonsky*

Dr. Losonsky was questioned via deposition on July 21, 2021. Plaintiffs' counsel inquired if he had ever been permitted to testify as an expert in any field, and Dr. Losonsky replied, "I don't remember." He was further asked if he had ever been permitted to testify about the location of the ordinary or mean lower water mark of a surface river to which he replied, "I don't know." He also was not sure if any court had every excluded or limited his testimony for any reason. Counsel continued to ask questions to determine Dr. Losonsky's familiarity with the background of the case as well as the area in question. For example, the following colloquies occurred:

37

Q. Do you understand the significance of the final judgment that the body of water in the Catahoula Basin in 1812 was not a lake, but a permanent channel known as the Little River?

A. Repeat that, please?

Q. Do you understand the significance of the final judgment that the body of water in the Catahoula Basin in 1812 was not a lake, but a permanent channel known as the Little River?

A. No.

Dr. Losonsky did not know who owned the land above the low-water mark, that the parties had agreed that the ordinary high-water mark was 36 feet above sea level, or that the area consisted of about 22,813 acres. He was later questioned:

Q. Okay. Do you understand and agree that the State only owns the land lying between the ordinary low-water mark on each side of the bed of the Little River as it channels though the Catahoula Basin?

A. Please repeat that.

BY MR. VERON:

Q. Do you understand and agree that the State only owns the land lying between the ordinary low-water mark on each side of the bed of the Little River as it channels though the Catahoula Basin?

A. No.

BY MR. VERON:

Q. Okay. Do you disagree with that?

A. I don't know.

Dr. Losonsky refused to identify the Little River Channel in photographs after being repeatedly asked by counsel. Counsel asked whether the water at the location of the gauge was hydraulically connected to the Little River as it runs though the Catahoula Basin, to which Dr. Losonsky replied that it was. He was then asked if that includes the Little River, and he replied, "I don't know." Moreover, he could not remember what the lowest water level in the Little River was although he knew the gauges took measurements daily. Dr. Losonsky was asked point-blank:

Q. . . . Are you able to tell us today what you understand the ordinary low-water mark of [the] Little River to be?

A. No.

Further questioning revealed he knew nothing about the locations of the gauges in relation to the Little River and what they measured. He did not know that the center gauge would never measure the lowest water levels because it was intended to determine the highest water levels.

### *Deposition Testimony of William Finley*

The transcript of the deposition of William Finley taken on August 3, 2021, was also proffered. Finley, a geologist and geoscientist, has never testified in court, never been asked to identify or locate the ordinary or mean low-water mark of a stream or water body, and did not know anything about this case until a month before the deposition. He said he was asked by LDNR's counsel to "review and comment on the methodology for determining low-water." He said he was "still formulating an opinion." He was unfamiliar with accepted methodology used by Louisiana courts to determine low-water marks of a river (i.e., *Cockrell*). Finley was questioned:

Q. Mr. Finley, what were your preliminary opinions that you expressed to the State?

. . . .

A. Yeah. As a preliminary opinion, they're in flux because I'm still waiting to get additional information, but I was, in essence, looking at the gauge data in different ways to see if we could see a pattern that might be representative of how to determine the data to be used for determining low-water. That's still preliminary because I haven't seen the rest of the data yet.

Q. Have you made any effort to look at the lowest water mark in each year –

A. Yes, sir.

Q. –as measured on a hydraulically connected water gauge to the Little River Channel and then added all that up and divided by the number of years?

A. Yes, sir.

Q. Okay, And what number did you get?

A. I don't recall the specifics of that number. This is information that I've been working on spreadsheets, et cetera, and I haven't committed to memory specific numbers.

Q. It's the number. It's only one number. You can't remember it?

A. I'm sorry, I was looking at a lot of different information.

When questioned what additional information he was waiting on, Finley stated that he was "trying to get some determination as to the geology, the geoscience of the Catahoula Basin so that I can put into reference the expected low-water versus high-water." He was unaware that there was an approved method to determine the low-water mark. In fact, before this case he did not even know what low-water mark meant, but he did state, "If you have data, you can figure out how to get to that number," even if you do not know what it is. Finley did not know the location of the gauges in relation to the Little River. He testified that he was given some data in documents authored by an unknown source, relating to a gauge that was used by Placid Oil during their oil and gas operations in the lake, and this was the data he was using to formulate opinions. He had no idea how many gauges were in the Catahoula Basin. The following exchange occurred:

Q. So it's your opinion that it is an intellectually honest thing to do to selectively choose the dat[a] that supports your opinion and ignore the data that contradicts it?

A. It's not ethical, but it's done.

*Testimony at the Hearing*

*John Steven Smith, Jr.*

Smith, the biologist program manager of the Louisiana Department of Wildlife and Fisheries, testified that he regularly visited the Catahoula Lake area until 2016, when he began handling a different area of the state as part of his job position. He stated he would go to the area two to three times per week. Smith was asked a variety of questions about dredging, silt, cleaning out the canal, and the opening and closing of gates, but he did not produce any testimony related to the low-water mark. On cross-examination, Smith recalled that in his deposition six days before the trial, he stated that he was unable to determine the low-water mark, that he had never been responsible for identifying the low-water mark during his career, and that he did not think the trial was about anything other than the low-water mark of the Catahoula Lake.

*Jared Anthony Couvillion*

Couvillion, a registered land surveyor, testified that he has participated in surveying related to water bodies such as in setting gauges for the Army Corps of Engineers, monitoring surveys on the Three River Control Structures, and aiding some hydrographic crews. He was accepted as an expert in surveying. On cross-examination, Couvillion admitted that as of a week before trial he did not know what the low-water mark was and he could not be definite in his answer because there were "some other factors that I have to explore first." He knew the trial was for the purpose of determining the low-water mark. He admitted he had never surveyed the ordinary low-water mark of a river or stream. Further, as of August 3, 2021, he had not done any survey or field work in this case. He stated that he was not contacted by LDNR until July 13, 2021. On re-direct, Couvillion testified he would able to survey the water bottom but he just had not had time.

41

*Dr. George Losonsky*

Dr. Losonsky has a PhD in geology, hydrogeology, and physical and chemical processes. Dr. Losonsky gave an extensive history in expert opinions but admitted that he had only testified as an expert witness one time. On cross-examination, Dr. Losonsky was questioned about his deposition testimony indicating he knew little about the area in question. At the end of the questioning, the trial court questioned him:

> Q. Dr. Losonsky, are you able to tell the Court today what the low-water mark is within that channel?
>
> A. (By the witness) That's not the Little River Channel.
>
> By Mr. Veron: Your Honor, I'm – I'm not gonna [sic] waste anymore of your time, after that answer.

Plaintiffs' counsel then renewed their objection, and the trial court issued reasons for judgment on the plaintiffs' exception to exclude Dr. Losonsky as a witness stating:

> Based upon the State's questioning of this witness and the traversal done by Mr. Veron, the Court is of the opinion that his scientific test – technical and specialized knowledge will not help the Court in this case. That to understand, it's not based on sufficient facts of this case. It's not the product of reliable principles and methods, and he has not reliably applied principles and methods, that this Court is aware of that is utilized in this very issue to the facts of this case.
>
> So, I – I don't see where his testimony would help the trier of fact in it, so.
>
> . . . .
>
> So I will not accept him as an expert to – to tell this Court what the low-water mark is. He hasn't even, I mean, his – based upon what he said, I'm not even sure he know [sic] the method of determining it.

The trial court later stated regarding Dr. Losonsky, when LDNR was discussing its final witness Mr. Finley, "I didn't find that his testimony would be

reliable, because I didn't find that his it was based upon the facts of the case. I found that his knowledge of facts of the case were deficient."

Thereafter, all parties agreed to proffer the testimony of Finley, the State's final witness.

The trial court then ruled on the low-water mark stating:

[T]he Court found that the testimony of Dr. Joseph Suhayda and the testimony of Mr. Mayeux were reliable; and that testimony was logical, and corroborated by data and substantiated by data; it consisted of years of data that was obtained from the Army Corps of Engineers. And I think the years of data over the forty-eight years was the most reliable.

. . . And the Court accepts the testimony that the ordinary low-water mark is 24.08 feet.

And, also, the Court wants to note that their – Mr. Suhayda's testimony regarding why he used the Diversion Gauge was, um, it was the most logical. As the Archie Gauge was ten miles away, the Center Gauge cannot measure annual lows, because it sits higher than the annual lows. So the Diversion Gauge, to me – this Court, was the most reliable source of the information, in assisting the experts and, and informing this Court as far as making their determinations.

### LDNR's Proffered Testimony

### Proffered Testimony of John Steven Smith, Jr.

Smith testified that aquatic vegetation makes it difficult to tell exactly where the water ends and the land begins.

### Proffered Testimony of Jared Anthony Couvillion

Couvillion testified that the Little River channel identified by Mayeux appears to have been dredged in the 1970s. Couvillion testified that Mayeux surveyed "a channel that, that is served to route water from the entrance to the exit of Catahoula Basin." He stated that he had a preliminary assumption that Mayeux surveyed a manmade canal rather than a natural river. He did not offer any testimony regarding the low-water mark.

43

***Proffered Testimony of Dr. George Losonsky***

Dr. Losonsky testified that he believed the ordinary low-water mark is 28 feet based on gauge readings from both the Lakeside Diversion Canal Structure Gauge and the Middle of Lake or Center Lake Gauge over the entire period since the construction of the control structures in 1972.  He stated that he also looked at:

> lidar elevations of the landscape around the entire Catahoula Basin. And I studied the USGS's bathymetry work.  I took the available bathymetry from the USGS.  I blended that in with surrounding lidar landscape topography, to create a complete map of the area.
>
> I then looked at – I then modeled the extent of water at various elevations, elevations that sprang out of the analysis of daily reading on those two gauges that I mentioned.  And I also looked at the water levels from a standpoint of navigability of the river to arrive at my conclusion.

He further stated that he studied the effects of the water table and interviewed someone at the Army Corps of Engineers.

***Proffered Testimony of William Finley***

Finley disagreed with Dr. Suhayda's determinations "[b]ecuase he used information based upon an assumption that I don't think works for this particular circumstance because of the geology involved.  There was no input, from a geologic aspect, that has a factor that should have been considered in this case."  Finley said the fluvial system needs to be understood "so that we can then apply an analysis of the data that allows us to understand the mechanics of the system," which he claimed Dr. Suhayda did not do.  He further disagreed with the methodology used by Dr. Suhayda to determine the low-water mark because it did not use enough data points and "doesn't represent ordinary conditions for the river system."  Finley was then asked if he had an opinion on the low-water stage, but he replied that he was not asked to find a number only evaluate the methodology for determining low-water. Nevertheless, he arrived at a number of 28 feet "based on the data distribution

patterns that work for this river system." He also arrived at a low-water stage of 27 feet based on keeping it maintained at an artificial basis.

Even from a cold record, the plaintiffs' experts were far more credible in their determinations regarding the low-water mark. The methodology used was an accepted one in Louisiana courts comprised of over fifty years of data from the U.S. Army Corps of Engineers. *See State v. Cockrell*, 162 So.2d 361 (using daily recorded water stages by the U.S. government, determine the lowest depth in each year, compute the average of said lows and arrive at a mean low-water level). That methodology was explained. On the contrary, LDNR's experts provided no methodologies to arrive at their conclusions of twenty-eight feet. Instead, they testified about collecting all kinds of information without relating what it had to do with the ordinary low-water mark. Moreover, there is no explanation as to why they could not tell the trial court a specific number earlier in the day, but were able to provide one in the proffered testimony taken that same evening. This seriously undermines the credibility of LDNR's witnesses. LDNR's own brief sets forth the reasons that the testimony was easy to discredit once considered (footnotes omitted):

> Mr. Couvillion's proffered testimony was competent, relevant, and would have helped the court understand the computation and location of an appropriate, science-based ordinary low. He offered opinion testimony within the field of his expertise that addressed the following:
>
> • The importance of examining historical documents such as the General Land Office maps as a starting point to understanding the waterbody to be surveyed;
>
> • That the location of the Little River within the Catahoula Basin identified by Plaintiffs' experts was actually a manmade canal that was dredged by the U.S. Corps of Engineers in 1972 and 1975;
>
> • That the Plaintiffs' survey did not accurately represent the historical path of the Little River within the Catahoula Basin.

45

We find no connection between the above information and the determination of the ordinary low-water mark nor does LDNR or its witnesses make the connection in proffered testimony or in brief. LDNR claims that these witnesses' expertise was valid regardless of whether they testified to an actual number representing the low-water mark. This is simply nonsensical. Without relating how the historical information affects the ordinary low-water mark today, the sole purpose of the hearing, LDNR's experts were simply giving a history lesson. LDNR makes claims that if they had been given the opportunity, the "diversity of information would have allowed the court to fairly determine the ordinary low as other courts have consistently done in the past." However, LDNR cites no cases where "other courts have consistently done so in the past." This equates to bombarding a trial court with an assortment of scientific and historical information without connecting its relevance to the determination of the low-water mark. This tactic fails.

LDNR makes sweeping claims about the importance of a "conservation pool protected by international treaties among dozens of landowners." The validity of this claim is impossible to determine from this record. LDNR's failed attempt to connect all of its various allegations through testimony and evidence of how it relates to the low-water mark is a red herring. The hearing's purpose was to set an actual number representing the ordinary low-water mark. LDNR failed to present any credible evidence disputing the plaintiffs' expert testimony. Accordingly, we find no error in the trial court's exclusion of witness testimony, and even after considering it, we find no error in the factual finding that the low-water is located at 24.08 feet.

***Absurd Result***

Finally, relying on La.Civ.Code art. 9, LDNR claims that the factual finding of the low-water mark boundary at 24.08 feet will lead to absurd results based on

previous findings by the court. Louisiana Civil Code Article 9 provides: "When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature." This assignment appears to be a catch-all argument that the result is wrong.

LDNR then goes on to discuss how the finding of the low-water mark at 24.08 feet will lead to absurd consequences in the river bed stating:

> Despite the trial court's finding in 2016 that the bed (land) of the river in the Catahoula Basin was at 27 feet, the court impossibly set an ordinary low almost three feet *below the land level*, at 24.08 feet. This finding creates a grossly unnatural relationship between the high bank of the river at 36 feet, and the weird, intermittent drizzle of a low bank at 24.08 feet. Because the court's finding is entirely based on one annual low data point for each year from a gage outside the river in a purposely lower artificial drainage canal, and because the court would permit no rebuttal to this nonsense, the court accepted that the top of the water lies beneath the prior court's determination where the land is. Thus, the only place the water can fit within that impossibly low standard is in the bottom of a dredged canal, and even then in only less than half of that canal as it traverses the Basin. The court refused to hear any evidence supporting a low that made any scientific sense. This absurdity should be corrected. This Court should remand the case to be reset for an ordinary trial schedule and give LDNR and the people of Louisiana a fair trial.

We note that Judge Boddie's opinion found that "[t]he lowest portion of *the lake's bed* of any appreciable extent is at elevation 27 feet m.s.l. [mean sea level]. . . ." We considered all of LDNR's proffered testimony and find that conclusions alleged cannot be reached based on that evidence. The veracity of these allegations cannot be determined from the record. LDNR's proffered expert testimony failed to address the alleged absurdities and their effect on the waterway. We can only rely on evidence in the record, and there is none. Accordingly, this assignment of error is without merit.

## CONCLUSION

The exceptions of lack of subject matter jurisdiction and no cause of action filed by the defendant-appellant, the State of Louisiana, through the Department of Natural Resources, are denied. The judgment of the trial court setting the low-water mark boundary of the Little River at 24.08 feet is affirmed. The trial court's grant of res judicata in favor of the plaintiffs-appellees, Steve Crooks et al., is reversed. All costs of this appeal are assessed against the defendant-appellant, the State of Louisiana, through the Department of Natural Resources.

**EXCEPTIONS DENIED;**
**AFFIRMED IN PART; REVERSED IN PART.**